# In the United States Court of Federal Claims

No. 09-440C
(Filed: May 18, 2010)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|   |   |
|---|---|
| **JAMES J. CHAPMAN,** | Judgment on Administrative Record; Military Discharge; Coast Guard Board for Correction of Military Records; Weight Manual; Personnel Manual; Physical Disability Discharge; Administrative Separation; Eating Disorder; Underlying Medical Condition; Weight Loss Probation; Reasonable and Consistent Progress |
| Plaintiff, |  |
| v. |  |
| **THE UNITED STATES,** |  |
| Defendant. |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Raymond J. Toney*, The Law Office of Raymond J. Toney, Woodland, CA, Counsel of Record for Plaintiff.

*Kenneth D. Woodrow*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, Counsel of Record for Defendant, with whom were *Steven J. Gillingham*, Assistant Director, and *Jeanne E. Davidson*, Director, Commercial Litigation Branch, and *Tony West*, Assistant Attorney General, United States Department of Justice; Of Counsel, *Robert Bruce*, Office of Claims and Litigation, United States Coast Guard, Washington, DC.

## OPINION AND JUDGMENT ON THE ADMINISTRATIVE RECORD

**DAMICH, Judge.**

This is an action on cross motions for judgment on the administrative record,[1] pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), regarding decisions of the Coast Guard Board for Correction of Military Records ("BCMR" or "Board") that upheld the Coast Guard's 2005 administrative separation of Mr. Chapman for failure to comply with weight and body fat standards.

For the reasons stated below, Defendant's motion for judgment on the administrative record is granted and Plaintiff's cross-motion is denied.

---

[1] Defendant also moved to dismiss, for lack of jurisdiction and failure to state a claim, Count 1 of Plaintiff's Complaint, challenging the decision-making process of the BCMR. In his cross-motion, Plaintiff advised that he does not oppose dismissal of Count I and it is hereby dismissed.

I.   Background[2]

Plaintiff James J. Chapman enlisted in the United States Coast Guard on July 28, 1986. AR90. His administrative discharge was effectuated on September 27, 2005. AR90.

Mr. Chapman had been assigned in October 2004 to the Coast Guard Cutter Mackinaw. Amend. Compl. ¶ 28. On March 9, 2005, Mr. Chapman's Executive Officer ("EO"), in an Administrative Remarks" form (also known as a "Page 7"), documented various command concerns about his "poor judgement [sic] and failure to lead by example." Among other concerns, he was advised about his current weight:

> You have had an ongoing struggle meeting the Coast Guard weight/body fat standards. Presently it appears that you exceed the body fat standards. Per the 23AUG04 Page 7 from the CO of enlisted personnel at the CG academy you were counseled on your responsibility to maintain weight or body fat standards and that exceeding those standards could result in you being processed for discharge. You have been counseled since your arrival by your Master Chief regarding your failure to comply with standards. You will be weighed on 01Apr05 for compliance with weight standards.

AR750.

On April 6, 2005, after being measured and weighed in the course of standard procedures, Mr. Chapman was found to weigh 259 pounds with a body fat percentage of 33%. AR61; Amend. Compl. ¶ 30. His height was measured at 68 and ¾ inches. AR61. His EO completed a Command Referral Form, by which Mr. Chapman was referred to a medical officer to determine whether it was medically safe for him to lose weight. *Id.* The Command Referral Form indicated that he was 70 pounds overweight and that his body fat acceptability was just 25%.

On April 8, 2005, Mr. Chapman's EO, in a "Page 7," advised Plaintiff of his excess weight and body fat, directed him to lose 70 pounds and 8% body fat by November 8, 2005, and advised him that failure to obtain weight and body fat compliance by the end of his probationary period would subject him to separation from the Coast Guard. AR62. Mr. Chapman signed the Administrative Remarks, acknowledging his commander's entry and noting that he had been afforded an opportunity to review "COMDTINST M1020.8 (series)"[3] ("the Weight Manual") and understood the action required. *Id.*

---

[2] These facts are taken from the parties' motions and the 844-page administrative record. References to the administrative record are cited herein in the form of "AR__" (page number).

[3] COMDTINST (short for "Commandant Instruction") M1020.8 is entitled, "Weight/Physical Standards for Coast Guard Military Personnel." *See* Pl.'s Cross-Mot. for J. on the Administrative R. and Opp'n to Def.'s Mot. for J. on the Administrative R. ("Pl.'s Cross-Mot."), Enclosure 1.

On April 13, 2005, Mr. Chapman was seen by Dr. Roderick Baltzer, the physician contracted by the Coast Guard. Amend. Compl. ¶ 32. Dr. Baltzer prescribed an appetite suppressant, Phentermine, and an exercise program. *Id.* He also completed his portion of the Command Referral Form, attesting that it was safe for Mr. Chapman to lose his excess weight and that there was no underlying condition explaining his excess weight and no underlying condition that would make fitness activities detrimental to his health. AR61; Amended Compl. ¶ 33.

On April 27, 2005, Mr. Chapman's EO prepared another Page 7 counseling form, criticizing him for displaying "a lackadaisical attitude" toward his weight loss program and advising him that, if he did not make "reasonable and consistent progress" toward weight and body fat loss by the mid-point of his probationary period, he would be processed for separation. AR63. In the April 27 Page 7, the EO noted that Mr. Chapman had been reminded in March to weigh in on April 1 and was given "specific tasking" to comply with weight standards (daily exercise, weekly weigh-in, and "continual progress"). His EO noted that his weight was 260 pounds as of April 25. It was also noted that Mr. Chapman acknowledged not having read the Navy fitness manual, as had been suggested to him, nor had he yet filled out a detailed fitness plan as required. *Id.*

Shortly thereafter, having assumed the duties of Supply Officer, on May 16, 2005, Mr. Chapman prepared and submitted a "relief letter" to his commander noting deficiencies in the cutter's procurement procedures and discrepancies in the file- and record-keeping system. The deficiencies included an allegation that cutter personnel had used government property for personal use. Amended Compl. ¶ 36.

On May 31, 2005, Mr. Chapman reported to Dr. Baltzer that he was experiencing "tingling" in his left hand. Amended Compl. ¶ 38. Dr. Baltzer noted, "In actuality, the patient's primary complaint is that he gets aching in the left interscapular area and the base of the neck posteriorly when he is doing an elliptical workout." AR203. Dr. Baltzer directed him to stop taking the Phentermine, cease "strenuous activity," and undergo cardiac testing. Amended Compl. ¶ 38; AR295. On June 10, he underwent an EKG and on June 23 took a "stress cardiolite" test. Amended Compl. ¶¶ 39, 40; AR295, 219, 220. Based on those results, he had an echocardiogram on July 11, 2005. AR 221-22. On July 22, 2005, his cardiologist concluded that his heart was normal, despite "mild hyperkinesis," and that it was safe to resume exercise and dieting without restriction. Amended Compl. 42; AR 227-28.

Mr. Chapman's EO had completed another Page 7 on June 14, in which he noted, "As of 13JUN05 you are 11 weeks into your mandatory 33 week weight loss period and you weighed 247 pounds. To date your weigh [sic] loss has not been substantive enough to achieve the mandatory weight loss. You have 5 weeks until mid period evaluation." AR756. Mr. Chapman, however, declined to sign this statement. Instead, he offered his command a revised version of the Page 7, which would have acknowledged a correction of the ending date of his probationary period, to December 8, 2005. AR 10 (Final Decision in BCMR Docket No. 2006-054, at 7). In the proposed revision, Mr. Chapman proposed a recitation that his weight as of June 6 was "248 pounds and [he] was at 30.5% body fat percentage." It also would have read that, "These results

show a loss of 11 pounds and a 2.5% body fat percentage during this period. This exceeds the 1% body fat per month requirements to demonstrate reasonable and consistent progress as defined in the reference." AR217. Apparently, this proposed revision to the June 14 Page 7 was not agreed to by his commander, because there is no signature on the form.

On July 6, 2005, Mr. Chapman requested retirement from Coast Guard service effective on September 1 of 2006. His request was approved on July 8, 2005. AR10.

On July 25, Mr. Chapman reported to the cutter's health services specialist that he was still experiencing various discomforts and pain, including shortness of breath, fatigue, and lack of concentration, and expressed concern about his current and long-term state of health. He advised that he would resume his daily workouts, but had "strong reservations concerning this prior to confirmation of my medical status and physical abilities." Amended Compl. ¶ 45; AR229.

On July 27, he filed an informal complaint against his command with the District Civil Rights Officer, allegedly that he was being unfairly singled out and disciplined. Amended Compl. ¶ 46; AR158-60.

On July 28, his EO prepared another Page 7, noting that his probationary period ending date was being corrected. Rather than an end date of November 8, 2005, the correct end date should have been December 13, 2005. His mid-period date was then recited as being August 1, 2005.[4] AR 132.

On August 1, he was weighed and measured by his unit's Health Services Technician. His weight was 254; his body fat was 30%. AR 130, 177-178. His "Weight and Body Fat Progress" chart, AR178, shows that from April 4 to May 30, just prior to his cessation of "strenuous activity" and Phentermine as directed by Dr. Baltzer, Mr. Chapman's body fat percentage had declined from 33% to 30.6%; his weight had decreased from 259 pounds to 253 pounds. From June 6 to July 25, the date on which he was advised that he could resume regular exercise, AR65, 228, despite his "strong reservations," AR229, his body fat increased from 30.5% to 31%; his weight increased from 248 pounds to 255 pounds. AR178.

On August 2, Mr. Chapman's commanding officer, Captain McGuiness, advised him by memorandum that he was initiating action to discharge Mr. Chapman from the Coast Guard for having "failed to maintain reasonable and consistent progress" during his probationary weight loss period. Amended Compl. ¶ 51; AR67. On August 4, Mr. Chapman submitted a formal EEO complaint memorandum to his commander, pursuant to guidance he had received from his Equal Opportunity Advisor in response to his informal complaint lodged on July 27. AR 156-57. On August 7, Mr. Chapman submitted a statement in response to his commanding officer's decision to separate him, alleging several miscalculations in the weight loss and probation period record asserted against him, rebutting certain of the measurements in the record, noting that his

---

[4] Pursuant to the Weight Manual, see ¶¶ 2.f.2, 4, 5, Plaintiff's probationary period properly is calculated at 8 months, beginning on April 13, 2005 (the date of the medical exam attesting that it was safe for him to lose weight). The mid-point of the 8-month period would have been August 12, 2005.

cardiac problems had slowed his weight loss progress, and requesting that his discharge be denied and that, if his discharge were to be denied, that his weight probationary period be held in abeyance until all of his medical issues were identified. AR69-70.

On August 10, Mr. Chapman was again weighed and measured by his unit's Health Services Technician. His weight was 250; his body fat was 32%. On the same date, his EO prepared another Page 7, noting his weight and body fat, concluding that he had failed to maintain reasonable and consistent progress, and notifying him that he was being recommended for separation. AR72. Captain McGuiness replied on August 12 to Mr. Chapman's statement for retention. AR75-77. The Acting Coast Guard District Commander endorsed the separation recommendation on the same date. AR74. On August 30, Coast Guard Personnel Command issued its order that Mr. Chapman be discharged no later than September 27, 2005, due to weight control failure. Amended Compl. ¶ 64; AR801.

Coast Guard personnel — outside of his Mackinaw command — reported measurements of Mr. Chapman, taken August 11, August 19, September 1, September 2, and September 12, indicating more favorable weight and body fat loss. See AR236-238, 281-283.

In addition to his formal EEO complaint of August 4, Mr. Chapman also submitted a relief request pursuant to Article 138 of the Uniform Code of Military Justice complaining that his commanding officer was utilizing the weight program "in an attempt to remove" him from the Coast Guard due to his July 27 harassment complaint and his May 16 identification of improper procurement procedures. AR194-200. On September 20, 2005, the District Commander denied his request for relief under Article 138. Am. Compl. ¶ 73.

On September 13, his command ordered him to undergo a hydrostatic test for body fat percentage. AR285. His body fat was reported as 37.7%.

He was honorably discharged on September 27, 2005, for weight control failure. Amended Compl. ¶ 79; AR90.

On January 23, 2006, Mr. Chapman applied to the Coast Guard BCMR either to vacate his discharge and reinstate him to active duty or to correct his military records, awarding him constructive credit for service, so as to allow him to retire with 20 years of service. AR97-105. On November 2, 2006, the BCMR found no error or injustice and denied relief. AR4-29. On November 28, 2007, Mr. Chapman requested reconsideration of its earlier decision on various grounds. AR403-419. The Chair of the BCMR granted reconsideration on the grounds that the initial record had not reflected the instructions of Dr. Baltzer to Mr. Chapman to cease taking the appetite-suppressant medication and to cease strenuous activity until cleared by the cardiology inquiry. AR296. The Chair of the BCMR denied reconsideration relating to Plaintiff's arguments based on a diagnosis he received in 1995 of "obesity [with] compulsive overeating." AR294, 296. The BCMR's final decision on reconsideration was issued on January 22, 2009, denying relief and finding that Mr. Chapman had "not prove[n] by a preponderance of the evidence that the Coast Guard committed error or injustice when it discharged him for weight control failure on September 27, 2005." AR306.

Plaintiff filed his amended complaint in this court on August 13, 2009. Final briefing on the cross-motions for judgment on the administrative record was completed on March 15, 2010.

## II. Jurisdiction

Plaintiff has stated a claim under the Military Pay Act, 37 U.S.C. § 204(a), to correct his service records to reflect retirement with 20 years of active service and for related back-pay, allowances, and benefits. Pursuant to the Tucker Act, the jurisdiction of the United States Court of Federal Claims encompasses claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Court's Tucker Act jurisdiction, however, "requires not only a claim against the United States, but also requires, based on principles of 'sovereign immunity,' that there be a separate money-mandating statute the violation of which supports a claim for damages against the United States." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997). "It is well established that [the Military Pay Act] serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge . . . If the discharge was wrongful the statutory right to pay continues; this right serves as the basis for Tucker Act jurisdiction." *Id.*; *see also Dolan v. United States*, 91 Fed. Cl. 111, 117 (2010).

## III. Standard of Review

The parties have filed cross-motions for judgment on the administrative record, pursuant to RCFC 52.1. RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005); *Dolan*, 91 Fed. Cl. at 117-18. Questions of fact are resolved by reference to the administrative record. *Bannum*, 404 F.3d at 1356; *Walls v. United States*, 582 F.3d 1358, 1368 (2009).

It is well settled that it is not the province of the court to determine who is fit, or not fit, to serve in the armed forces. *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). In reviewing the determinations of a military corrections board, a plaintiff must demonstrate "by cogent and clearly convincing evidence," *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986), that the board's determination was "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010).

In the course of its review, the court does not sit as "a super correction board." *Skinner v. United States*, 594 F.2d 824, 830 (Ct. Cl. 1979). Rather, the agency decision is generally entitled to substantial deference. *Van Cleave v. United States*, 70 Fed. Cl. 674, 678 (2006). "When substantial evidence supports a board's action, and when that action is reasonable in light of all the evidence presented, the court will not disturb the result." *Pope v. United States*, 16 Cl. Ct. 637, 641 (1989). The court's review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157. Furthermore, there is a "presumption of regularity that attaches to all administrative decisions." *Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003). To

prevail here, Plaintiff must overcome "the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979).

Nevertheless, a court may find a correction board's decision to be arbitrary and capricious "if the board fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the board, or 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Van Cleave*, 70 Fed. Cl. at 679 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)). When a corrections board fails to redress "clear injustice," its decision is arbitrary and capricious and must be overturned on review. *Boyer v. United States*, 81 Fed. Cl. 188, 194 (2008). As Plaintiff properly notes, the military has an obligation to follow its own procedures. "The military no less than any other organ of the government is bound by statute, and even when granted unfettered discretion by Congress the military must abide by its own procedural regulations should it choose to promulgate them." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

IV.   Discussion

  A. Decision of the BCNR

In his initial application to the BCMR for reinstatement or for constructive credit for active duty service sufficient to entitle him to retire with 20 years of service, Mr. Chapman made several arguments. He claimed that he had "oscillated in and out of weight standards" since his entry upon active duty and that the Coast Guard had "condoned for 19 years his marginal weight performance." It was therefore inequitable to separate him in his last year of service, given that his weight did not keep from superior performance, and it was contrary to "common decency." He argued also that the initiation of discharge proceedings was "reprisal" both for his May 16, 2005, relief letter and for his August 4, 2005, EEO complaint. Furthermore, he maintained that his discharge was procedurally flawed in that his probationary period had been improperly calculated, by both start date and concluding date (and that therefore separation prior to his probationary mid-point date was premature and pretextual); that the only measurement process authorized by Coast Guard regulations for body fat was tape measurement, not hydrostatic testing; that separation for "obesity," pursuant to the Personnel Manual, required that a doctor first attest in writing that his obesity was due to food or beverage intake; and that he should have been given the opportunity of a separation hearing. AR97-105.

The Board's summary of Mr. Chapman's record indicates that he had previously been placed on weight probation in 1992, 1993, 1998, 2000, 2001, 2002, and 2003. AR6. He was warned each time about the possibility of discharge on account of his weight and he achieved compliance through a combination of diet and exercise. *Id.* In January 2004, he was again put on weight probation and given permission to undertake elective "abdominoplasty/liposuction" surgery in July 2004. AR7. According to the Board summary, "In August 2004, the applicant weighed 244 pounds but was deemed to have met requirements because his body fat was measured at 25%." *Id.* In an email to a Coast Guard assignment coordinator in which he

requested transfer to the Mackinaw, Mr. Chapman "apologize[d] for the trouble I have caused the CG and [the assignment] office with my weight issues and hope that the corrective surgery that I had performed and funded will ensure no further appearances on the Weight Program." *Id.*

The Board's decision summarized the regulations applicable to Mr. Chapman's application. AR20-22. Among the relevant provisions of the Coast Guard's Weight Manual were the following: Article 2.E.3 provides that a member with an "underlying medical condition" that limits participation in a specific portion of his fitness assessment is excused "from only that portion of the fitness assessment"; Article 2.E.4 provides that a member with an underlying medical condition that makes fitness activities detrimental to his health is "still responsible for meeting MAW [maximum allowable weight] standards within the timeline of the probationary period"; Article 2.F.1 stipulates that the probationary period cannot extend beyond a maximum period of 36 weeks; the calculation of the probationary period, per Article 2.F.4, is the amount of time it would take for the member to lose excess weight at an average of one pound per week or one percent body fat per month, whichever is greater; Article 2.F.5, however, provides that if by both calculations (weight and body fat) the member's probationary period would extend beyond 36 weeks, the member "shall be" processed for separation; Article 2.F.5. provides that if one calculation would extend beyond 36 weeks and one less than 36 weeks, the member's probationary period shall be assigned as the lesser period; under Article 2.F.3, if a doctor determines that the member has a medical condition that prevents him from losing weight or body fat at the prescribed rate, his commanding officer "may" request permission to stay the running of the period; Article 2.F.6 provides that members should demonstrate "reasonable and consistent progress" toward their weight goals during probation, specifically including, by way of example, losing "approximately half of the required weight or half the excess percentage of body fat by the midpoint of the probationary period"; Article 3.A.2 provides that members determined to be in a "not-fit-for-full-duty status" for 30 days or fewer "shall" have their probationary period held in abeyance, provided they have a physician's statement that the physical condition precludes weight loss.

Last, Article 12.B.12.a.10 of the Personnel Manual provides that a member may be discharged for the convenience of the government due to obesity, "provided a medical officer certifies a proximate cause of the obesity is excessive voluntary intake of food or drink, rather than an organic or other similar cause apparently beyond the member's control." AR22.

The Board disagreed with Mr. Chapman's claim that the Coast Guard had condoned his excess weight, pointing out that he had "habitually and firmly" been required to regain compliance each time and warned of the possibility of separation if he failed. AR23. The Board also rejected his claim of discharge due to retaliation. Mr. Chapman had lost only 5 of 70 pounds at nearly the midpoint of his probationary period, his command's action was the continuation of counseling that had begun 10 months prior, and that even the statement of a supportive crewmate corroborated a finding that Mr. Chapman's discharge was related to his lack of progress on weight reduction rather than retaliation for his letter noting procurement deficiencies or for his EEO complaint. *Id.* As to procedural deficiencies, the Board determined that Mr. Chapman was not prejudiced by the initial inaccuracy of the end date of his probationary period. AR24. In addition, doctors had certified on April 13, July 22, and August 10 on Command Referral Forms that Mr. Chapman had no underlying medical condition causing

his excess weight and that it was safe for him to exercise and lose weight. *Id.* Specifically, the Board found that, although Command Referral Form language did not mirror the language in Article 12.B.12.a.10 of the Personnel Manual regarding proximate cause of obesity due to excessive voluntary intake of food and drink, "the purpose and meaning of the certification provided on the form [was] sufficient to meet the requirements of the Personnel Manual." *Id.*

With regard to Mr. Chapman's underlying claim that his probationary period should have been suspended, the Board found that there was insufficient evidence in the record proving that he had been instructed by his doctor to stop dieting and exercising.[5] Given Mr. Chapman's weight and body fat calculation on August 1, 2005, 254 pounds and 30% body fat, and on August 10, 250 pounds and 32% body fat, the Board sustained the conclusion of his commanding officer that he was not making "reasonable and consistent progress." As to the hydrostatic testing on September 13, performed in response to Mr. Chapman's continued complaints, the Board found that it was authorized pursuant to Article 3.C.2 of the Weight Manual, granting the Commandant "final authority for procedural and policy determinations" in "unique conditions" where "special consideration is warranted." Pl.'s Cross-Mot., Encl. 1 at 3-2.

The Board also found that a member is not entitled to a hearing before an administrative discharge board when he is discharged due to weight control failure. AR27.

On November 2, 2006, the Board issued its "Final Decision" denying Mr. Chapman's application. AR4-29.

### B.  Decision of the BCNR on Reconsideration

Mr. Chapman filed an application for reconsideration of the BCNR Final Decision on November 28, 2007. He sought reconsideration based on two arguments. First, although acknowledging that he had not raised this matter in his original application, he argued that he had been diagnosed by the Coast Guard in 1995 with an eating disorder, "Compulsive Overeating," which he describes as a chronic medical condition that impeded his ability to manage his weight and body fat. AR405-406. In 1998, he was directed to undergo, and he completed, intensive treatment for his weight disorder at a naval hospital addiction clinic. AR406. He had also been diagnosed with depression and anxiety. *Id.* His command was aware, or should have been aware, of his medical record. *Id.* He avers he should have been referred for a physical disability evaluation and he could not be discharged for his weight control failure "where medical conditions are an underlying cause of the failure." AR413.

In addition, Mr. Chapman provided evidence that Dr. Baltzer had indeed directed him to stop exercising in the early summer of 2005 pending the determination of his cardiac condition. He argues that therefore his command should have suspended his probationary period and "there is no reason to conclude that he would not have achieved his weight and body fat limitations" by the time of an end date adjusted accordingly. AR417.

---

[5]  This finding was the basis on which Mr. Chapman was subsequently granted reconsideration by the BCMR.  *See* infra.

The Board chair granted reconsideration solely on the question whether the Board would have reached a different conclusion if it had had Dr. Baltzer's letter in the earlier record. It did not grant reconsideration on the issue of his compulsive eating diagnosis because that diagnosis had been known to the Board and it would not have barred administrative separation under Article 12.B.12 of the Personnel Manual. In that respect, the Board noted that the record did not present substantial evidence to support Mr. Chapman's claim that he suffered from a physical disability "that rendered him unfit for continued service" or that entitled him to physical disability processing and a physical disability, rather than administrative, separation. AR302. It was not persuaded that "compulsive eating disorder" was a medical condition contemplated in the Weight Manual to justify an abeyance of weight probation. "It is not a physiological condition and it is not even a defined mental illness or disorder under the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, (DSM)." Mr. Chapman's compulsive eating diagnosis was based on regularly overeating at and between meals and did not qualify as "binge-eating disorder," which is a disorder noted in the DSM. AR303.

In addition, the Board determined that Dr. Baltzer's letter would not have made a difference in the Board's earlier denial of his application. Despite his inability to participate in strenuous activity for several weeks, the Board concluded that under Article 2.E.4 of the Weight Manual he was still required to achieve weight and/or body fat compliance within his probationary period, "presumably by adopting a healthy, low calorie diet." AR304. No doctor had found that weight or body fat loss would be detrimental to his health, as required under Articles 2.E.1 and 3.A.1 of the manual, nor was he found unfit for duty as required for an abeyance under Article 3.A.2. *Id.* Despite his commanding officer's misstatement in a letter on August 12, 2005, recommending Mr. Chapman's discharge ("no grounds to cease weight loss activities . . . is and has always been fit for full duty and fitness exercise"), his commanding officer, the District Commandant, and the Coast Guard Personnel Command had had access to his medical records and they knowingly determined that he had no grounds for entitlement to an abeyance under the regulations. AR305.

The Board issued its Final Decision on Reconsideration on January 22, 2009, denying Mr. Chapman's application for relief.

### C. Plaintiff's Claims

Plaintiff makes several, in part overlapping, claims that the Board's actions were not in accord with Coast Guard regulations and unsupported by substantial evidence. First, he argues that the Board improperly upheld the Coast Guard's failure to suspend his probationary period while he underwent cardiac evaluation. Second, he avers that he should have been processed for physical disability separation, rather than administrative separation, because of an eating disorder; that the Coast Guard should have referred him for treatment by a psychiatrist or psychologist in consideration of an eating disorder; and that the referral would likely have resulted in an abeyance of his probationary period. Third, his separation was unlawful without a specific medical certification that the proximate cause of his obesity was excessive voluntary intake of food or drink, "rather than organic or other similar causes apparently beyond the member's control," per Personnel Manual, Article 12.B.12.a.10. Fourth, Mr. Chapman's

involuntary separation, initiated earlier than the mid-point of his probationary period, and his commanding officer's refusal to suspend his probationary period were in retaliation and reprisal for communications critical of his command.  Last, Mr. Chapman had achieved compliance with body fat standards on September 1, 2005, and therefore his separation was unjustified.

                        1.    Suspension of Probationary Period

Under Article 2.F.3 of the Weight Manual, a unit commanding officer may request authorization to hold a weight probationary period in abeyance:

> If a physician determines a member's medication or medical treatment or condition prevents them [sic] from losing weight or body fat at the required rate, the unit commanding officer may request authorization from Commandant (G-WPM-1) to hold the probationary period in abeyance for a specified period of time.

The Weight Manual further explains, in the next sentence of the same article, that such an abeyance avoids the "unintended consequence of penalizing a member . . . who, through no fault of his or her own, is battling a medical condition that makes weight loss challenging or impossible."

The Government urges the court to decline to review Plaintiff's claim regarding abeyance because the provision is discretionary, not mandatory, and "is like thousands of other routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of the courts to wrestle with." *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988).  The Government maintains that the inquiry whether the Coast Guard abused its discretion in Mr. Chapman's situation is nonjusticiable because there are no tests or standards to apply which are within the experience and competence of the judiciary.

The Court need not, however, delve on its own into Mr. Chapman's medical circumstances in deciding whether there was substantial evidence for the Board's decision upholding the Coast Guard's non-grant of abeyance in his probationary period.  The predicate in the regulation for a unit commander's discretion to seek authorization for such an abeyance is a determination by a physician that the member could not lose weight or body fat at the required rate due to his medication or medical treatment or condition.  Neither Dr. Baltzer nor Mr. Chapman's cardiologist made such a determination.  Nor can it be said that Mr. Chapman's 1995 diagnosis of obesity with compulsive overeating constituted a medical determination that he could not lose weight.  In fact, as evidence to the contrary, in all of his earlier weight probations, despite that diagnosis, he was able to lose sufficient pounds and/or body fat to obtain compliance with the weight guidelines.

The 52 days during which Mr. Chapman was counseled to cease taking his Phentermine medication and to avoid strenuous exercise must certainly have contributed to the challenge he faced in losing weight and/or body fat.  Whether it was sufficiently challenging to warrant this Court's upending of his commanding officer's assessment of his ability and responsibility to lose

weight through caloric reduction is indeed the sort of inquiry beyond the court's competence.[6] The provision of the Weight Manual at issue here[7] also suggests the relevance of the question of "fault" on the part of the service-member. Mr. Chapman was counseled about his weight in the fall of 2004 when he was first posted to the Mackinaw and was counseled again in March of 2005. His attitude was criticized as "lackadaisical" as late as April 27, 2005. The Court will not second-guess the conduct of his commander in not granting an abeyance of his probationary period. There was no abuse of discretion and the decision of the Board is supported by substantial evidence.

        2.    Eating Disorder and Failure to Refer for Evaluation and Treatment

The BCMR Chair did not grant reconsideration, based on two grounds, regarding Mr. Chapman's newly raised issue of an eating disorder. AR296-97. First, the Coast Guard was appropriate in considering his separation administratively because his compulsive overeating diagnosis did not qualify him for a physical disability separation. Second, his diagnosis was known to the Board and it did not entitle him to an abeyance of his probationary period nor did it entitle him to retention on active duty.

As to his claim of physical disability, the Board found that

> the record contains no substantial evidence to support the applicant's claim that while serving on active duty he suffered from a physical disability that rendered him unfit for continued service and entitled him to PDES [Physical Disability Evaluation System] processing and a physical disability separation. The fact that he had been treated for anxiety and mild depression due to stressful events in his life is not proof that he was unfit for duty because of a disqualifying anxiety disorder or major depression. Compulsive overeating disorder is not a physical disability under the VASRD [Veterans Administration Schedule for Rating Disabilities]. Members whose compulsive overeating prevents them from meeting Coast Guard weight standards or from achieving compliance during weight probationary periods are not processed for disability separations; instead they are, like the applicant, discharged administratively under Article 12.B.12 of the Personnel Manual.

AR302 (footnotes omitted).

---

[6] The Board also concurred with the Coast Guard's understanding that the phrase "medical condition" in Article 2.F.3 was not intended to encompass abeyance requests for purely physical conditions such as "twisted ankles, pulled muscles, broken bones, etc.," (and presumably cardiac concerns) that make it difficult to exercise. AR303.

[7] Article 3.A.2 of the Weight Manual is not at issue here because it applies only to members determined to be in a "not-fit-for-full-duty status." Mr. Chapman was never determined to be not fit for duty during the time period in question.

Mr. Chapman's related claim is that "the Coast Guard failed to refer Plaintiff for medical and psychological evaluation as required by law" because he had an eating disorder. Am. Compl. at 25. He argues that the proper identification and treatment of his disorder "would likely have resulted" in suspension of his probationary period, *id.* at 26, ¶ 153, that therefore his involuntary separation for weight control failure was gross error and injustice. *Id.* at 27, ¶ 154.

The inquiry whether such referral was required begins with Article 3.E of the Weight Manual, which provides that "[c]ases involving members who display tendencies toward compulsive overeating or are diagnosed with an eating disorder shall be handled in accordance with the provisions of the Medical Manual . . . ." Article 5.B.18.d of the Medical Manual in turn states, "Individuals suspected of having an eating disorder shall be referred for evaluation by an Armed Forces psychiatrist or Armed Forces clinical psychologist."

The Government, however, notes that Mr. Chapman did receive treatment in 1995 when a Navy physician first diagnosed his condition as "obesity with compulsive overeating." AR450. In addition, in 1998, because he was "exceeding military height/weight/body fat standards," Mr. Chapman was directed to attend, and he successfully completed, a two-week outpatient weight management program at the Addictions Rehabilitation Clinic, Jacksonville Naval Hospital. AR453-56. The program concluded with a "formal one year continuing care plan." AR455-56. Thus, Mr. Chapman did in fact obtain referral and treatment contemporaneous with his diagnosis.[8]

Despite that past treatment, Mr. Chapman argues that his record of continued struggles with his weight, as evidenced by his weight control probations in 2000, 2001, 2002, 2003, and 2005, reflected an ongoing eating disorder. His commander in 2005 should have known to suspect an eating disorder and therefore had an obligation to refer him again for evaluation and up to six months of renewed treatment.

Plaintiff disputes the finding of the Board that "compulsive eating disorder" is not "the type of underlying medical condition contemplated in Article 2.F.3 of [the Weight Manual] to justify an abeyance of weight probation." AR303. In reaching that conclusion, the Board elaborated, "It is not a physiological condition and it is not even a defined mental illness or disorder under the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM), which is relied on by the Coast Guard in identifying mental illness and disorders." *Id.* The Board further noted that the DSM lists "eating disorders 'not otherwise specified,'" which includes a "binge-eating disorder," but that Mr. Chapman's diagnosis in 1995, in light of his medical questionnaire responses at the time, was based on "regularly overeating at and between meals," rather than binge eating. *Id.* Plaintiff argues that the Board was "unqualified to diagnose or rule-out medical or psychiatric conditions" and that it cited no authority to conclude that "compulsive eating disorder is not a physiological condition." Pl.'s Cross-Mot. at 29. Mr. Chapman also suggests that his receipt of a diagnosis of an "eating disorder not otherwise specified" by a Department of Veterans Affairs physician in March 2007

---

[8] In addition, Chapter 5.B.1 of the Medical Manual provides that such treatment is discretionary "based on a review on a review of all factors, including the opinion of experts, probability of a successful outcome, and the presence of other physical and mental conditions." AR297.

corroborates his claim of the same condition in 2005.[9]  Pl.'s Reply to Def.'s Opp'n to Pl.'s Cross-Mot. for J. on the Admin. Record at 14.

The Court finds the decision of the Board affirming Mr. Chapman's separation despite his claim of an eating disorder and a failure to refer him for treatment was supported by substantial evidence.  Mr. Chapman's diagnosis in 1995 of obesity with compulsive overeating did not constitute a physical disability under the provisions of the Weight Manual, Article 3.E,[10] and the Medical Manual, Article 5.B.18.d.  His discharge for weight control failure was therefore properly considered under the procedures for administrative separation, rather than under the Physical Disability Evaluation System.  Furthermore, compulsive overeating is not identified as an eating disorder in Article 5.B.18.d of the Medical Manual.  To the extent it would fall within the category of an "Eating disorder NOS" [not otherwise specified], *see* Article 5.B.18.d(2), a member so diagnosed would be processed administratively pursuant to Article 12.B.12 of the Personnel Manual.

Mr. Chapman was in fact referred for evaluation and treatment in 1998.  He successfully completed the two-week program, wherein he was instructed in weight management techniques to meet physical readiness standards.  AR455.  On the several subsequent occasions in which he was put on weight probation, he was able to achieve compliance with weight standards.  It was not therefore evident from his past medical record that in 2005 he suffered from an eating disorder.  Even if Mr. Chapman's condition in 2005 should have been identified by his command as a continuation of his compulsive overeating diagnosis, it was not a defined mental illness or condition under the DSM.  AR303.  Mr. Chapman's medical questionnaire answers in 1995 provided substantial evidence for the Board's finding that he had not previously been diagnosed with a "binge-eating disorder."  *Id.*  Furthermore, while the Medical Manual provides in Article 5.B.18.d that individuals suspected of an eating disorder shall be referred for evaluation, the same article also establishes that treatment is discretionary.  "Treatment *may* be authorized in accordance with the same criteria as other mental conditions."  (emphasis added).  In respect to treatment, Article 5.B.1 states, "The decision to provide treatment for mental health conditions will be based on a review of all factors, including the opinion of experts, probability of a successful outcome, and the presence of other physical or mental conditions."  Accordingly, it was not error that the Coast Guard did not refer Mr. Chapman for eating disorder treatment in 2005.

---

[9]  Mr. Chapman, however, never sought to obtain any separate medical determination in 2005 of an underlying condition that would warrant holding his probationary period in abeyance.  AR298.  In addition, VA disability determinations are based on an evaluation of an individual's capacity to function in the civilian world, whereas the military utilizes the ratings schedule to determine fitness for performing the duties of office, grade, and rank.  *Childers v. United States*, 81 Fed. Cl. 693, 715-16 (2008).  The VA ratings accordingly are not binding on the service branch, *id.* at 716, and may be inconsistent with a Board's or service branch's disability determination.  *Williams v. United States*, 91 Fed. Cl. 560, 568 (2010).

[10]  Article 3.E of the Weight Manual is entitled, "Compulsive Overeating *and* Eating Disorders" (emphasis added), suggesting that the Coast Guard views the conditions to be distinct.

3. Medical Certification Prior to Discharge

In a related claim of error, Mr. Chapman alleges that his administrative discharge was unlawful because the Coast Guard failed to obtain a medical certification in conformity with Article 12.B.12.a(10) of the Personnel Manual.  That provision authorizes the discharge of a member for the convenience of the Government due to "[o]besity, provided a medical officer certifies a proximate cause of the obesity is excessive voluntary intake of food or drink, rather than organic or other similar causes apparently beyond the member's control."  *See* AR22.

The Board noted, however, that on three occasions — April 13, July 22, and August 10, 2005 — doctors certified on Command Referral Forms that, inter alia, there was no "underlying medical reason causing [Mr. Chapman's] excess weight," that it was "safe for [Mr. Chapman] to lose the excess weight to comply with established standards," and that there was no "underlying medical condition that would make fitness activities detrimental" to his health. AR24, 61.  The Board found that the language of the Command Referral Form was sufficient in place of the language of the certification in the Personnel Manual "because the certifications indicate that the applicant had no underlying medical condition that caused his obesity and the doctors had counseled him to lose the excess weight by diet and exercise."  AR24.

Mr. Chapman raises a credible point that the two forms are intended for different purposes.  The Command Referral Form is intended to clear a member for weight loss, including diet and exercise, while the medical certification is required to qualify a member for separation due to obesity.  In addition, he argues that the phrase "or similar causes" in the certification requirement is sufficiently broad so as to encompass psychological or psychiatric conditions not necessarily of an organic or physiological nature.  Thus, presumably, Mr. Chapman's compulsive overeating diagnosis might be considered a "similar cause" even if did not qualify as a medical condition.

The Government argues that the Coast Guard is entitled to deference in its interpretation that the Command Referral Forms met the requirements of the Article 12.B.12.a(10) medical certification.  Def.'s Opp'n at 14.  On the other hand, citing *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995), Plaintiff emphasizes that, in cases alleging procedural violations, the court simply applies the facts to the regulation in question.  Because there was no certification in the precise words of Article 12.B.12.a(10), Mr. Chapman claims that his discharge was unlawful.

The Court is not persuaded that such a precise recitation is required.  The medical certification requirement is prescriptive in that it is clearly the substance of the medical certification that serves as a final safeguard for the service-member prior to an administrative discharge for weight control failure.  The necessary inquiry in this regard, then, is whether indeed the three Command Referral Forms in the record constitute a sufficient attestation that Mr. Chapman's weight condition was driven by his voluntary excessive intake of food and/or drink and not attributable to a medical or similar cause beyond his control.

The notion of voluntariness was addressed in *Favreau v. United States*, 49 Fed. Cl. 635 (2001).  There, former military personnel who were discharged for failure to meet weight and

-15-

fitness standards challenged the Government's recoupment of enlistment bonuses under regulations allowing recoupment from members who had voluntarily failed to complete their terms of enlistment. The question whether the service-members' failure to complete their terms was voluntary depended on whether they were separated "for engaging in conduct that is within the control of the service-member but incompatible with military service." *Id.* at 638 (quoting the Director of the Office of Officer/Enlisted Personnel Management). The court summarized the practice of the Department of Defense in ascertaining voluntariness: "So long as there is counseling and an opportunity to overcome deficiencies, and so long as persons with medically-diagnosed problems that interfere with weight reduction or maintaining physical fitness may not be separated for weight control failure or lack of physical fitness, the failure to meet standards is deemed volitional." *Id.* at 639.

Mr. Chapman did receive counseling, over many years, and was afforded many occasions to overcome his weight deficiencies. The doctors who completed the Command Referral Forms declared that there was no underlying medical condition causing his excess weight. It was reasonable for the Board to conclude that it was "within his control" to manage his weight to achieve weight compliance, especially given his record in reaching compliance on the several past occasions when he had been put on weight probation. It was also reasonable for the Board to conclude logically that, if his excess weight was not due to an underlying medical condition and was not beyond his control, therefore it was due to excessive voluntary intake of food and/or drink. Accordingly, the Court finds that the essential safeguards of the certification statement were preserved through the issuance of the three Command Referral Forms.

### 4. Retaliation because of Critical Communications

Mr. Chapman characterizes as capricious and unsupported by substantial evidence the Board's decision rejecting the claim that his discharge was in retaliation for his May 16, 2005, letter noting deficiencies in the ship's procurement and record-keeping procedures, for his claim of harassment, informally made in July and formally submitted on August 4, 2005, to his commanding officer, and for his August 27, 2005, request for redress of grievances under Article 138 of the Uniform Code of Military Justice. In particular, he argues that the August 12, 2005, memorandum of his commanding officer, Captain McGuiness, in support of Mr. Chapman's separation was "fictitious" in that it misrepresented Mr. Chapman's record of service and his fitness for weight-loss exercise. Mr. Chapman alleges that Captain McGuiness was motivated by bias, resentment, and hostility when he "rushed Mr. Chapman out the door" before the conclusion of his probationary period (and in fact prior to the mid-point) and refused to suspend the discharge process even when Mr. Chapman had demonstrated weight compliance, by measurements taken on September 1, 2, and 12. He concludes, and argued to the Board, that Captain McGuiness's hostility and determination to discharge Mr. Chapman was in reprisal for the May and July/August communications.

Because of the Captain's improper motivation in discharging him, Mr. Chapman argues that the Board was mistaken in affording Captain McGuiness the presumption of correct, lawful, and good faith performance of his duties. In addition, he faults the Board for failing to credit the statements of two crewmembers who submitted statements noting ship morale problems, the commanding officer's "vendetta" to destroy Mr. Chapman's career, his having targeted Mr.

Chapman "from the beginning" because of his weight, and the disparate and harassing treatment Mr. Chapman received from his command. Finally, Mr. Chapman assigns as error the Board's disregard of the fact that Captain McGuiness initiated Mr. Chapman's separation on the same day that he learned informally of Mr. Chapman's July 27 informal harassment complaint.

It is true that Captain McGuiness was inaccurate in his statement of August 12 that "At no time has [the participant] been medically unfit to participate in a weight reduction exercise program." AR76. In a similar vein, Captain McGuiness can fairly be faulted for the ambiguity of his statement that, since Mr. Chapman was put on weight probation, medical professionals had consistently concluded that "there were no grounds to cease weight loss activities." *Id.* The statement is ambiguous because it is not clear whether Captain McGuiness meant "any" weight loss activities or "all" weight loss activities. Clearly, if he meant the former, the statement is incorrect because Dr. Baltzer had in fact counseled Mr. Chapman at the end of May 2005 to cease both his Phentermine intake as well as exercise in general or at least "strenuous" exercise. Mr. Chapman was released back to his full fitness regime only as of July 22, 2005.

These two particular statements of Captain McGuiness, the one inaccurate and the second at worst ambiguous, do not, however, overcome the propriety of the Board's extension of the presumption of correct, lawful, and good faith performance to Mr. Chapman's superiors. In fact, the Board noted that one crewmate's statement that Mr. Chapman had been targeted because of his weight "from the beginning" of his tenure with the Mackinaw, which was in the fall of 2004, completely undercuts Mr. Chapman's allegation that his treatment was due to retaliation for the communications in May and August, 2005. AR23.

The Board noted that Mr. Chapman had lost only five of 70 pounds at the approximate mid-point of his probationary period (even accounting for the extension of his probationary period to December 12, 2005). *Id.* The record of his official weigh-ins shows that his weight was 254 pounds, down from 259 at the onset, on August 1, with a body fat percentage of 30. AR130. There was demonstrable evidence in the record that he was not making the "continuous and reasonable progress" required under Article 2.E.6 of the Weight Manual. At the mid-point, he should have lost approximately 35 pounds and been down to no more than 29% body fat. While close on the body-fat standard, he was clearly not at all close to losing the number of pounds required at that point. Furthermore, his body fat percentage reduction was fluctuating, not showing "continuous" progress. It began at 33%, was 30.5% on May 31, 34% on June 20, 30% on June 27, 31% on July 11, 30% on July 19, 31% on July 25, and 30% on August 1. It was 32% on August 10. *Id.* Under Article 2.E.4 of the Weight Manual, Mr. Chapman was still responsible for meeting minimum acceptable weight standards despite the limitations in place through July 22 on account of his cardiac concerns. In light of this record and the requirements of the Weight Manual, there is substantial evidence that it was Mr. Chapman's weight situation, not reprisal for other reasons, that was the foundation for his discharge.

The Court finds that Mr. Chapman has failed to meet his burden of proof that his discharge was due to retaliation or reprisal for communications critical of his command or for his complaints of harassing treatment. "Courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig*, 719 F.2d at 1156.

5. Weight Compliance

Mr. Chapman avers that he actually achieved weight compliance as of September 1, 2005, and that his subsequent separation effective September 27, 2005, was therefore unlawful. The record includes emails reporting measurements of Mr. Chapman taken on September 1, September 2, and September 12, each reporting body fat compositions below the 25% goal for weight compliance. AR281, 282, 283. The salient aspect of these measurements, however, is that they were taken outside of Mr. Chapman's direct command, albeit by Coast Guard personnel at other stations or hospital facilities.

The measurements taken on September 1 are only in the record in the form of an email from Mr. Chapman himself to his command reporting that "HS1 Gomez" of the Coast Guard Station Grand Haven measured Mr. Chapman's weight as 245 and his body fat as 24%. Mr. Chapman acknowledged the measurements as "informal." AR281. The second measurement in question was taken on September 2 by "BM2 Ryan DeShazo" of the Coast Guard Station Muskegon. AR 282. Mr. DeShazo's email to Mr. Chapman bears the title, "Unofficial Measurements as Per SKC Chapman's Request," and reports weight of 244 ½ pounds and body fat of 24%. *Id.* On September 12, Christopher Farrell of the U.S. Naval Hospital Great Lakes reported by email to Mr. Chapman's command that Mr. Farrell had measured Mr. Chapman at 23% body fat (no indication of weight). AR283.

Mr. Chapman argues that the presumption that military officials perform their duties correctly, lawfully, and in good faith applies with equal force to the Coast Guard personnel outside of Mr. Chapman's command who measured him informally and found him within the body fat guidelines. The Government responds that Mr. Chapman's command was not required to consider the unofficial, outside of chain-of-command measurements, that there was no evidence that they were reliable, and that nothing in the Weight Manual or the Personnel Manual required consideration of non-official measurements.

Notwithstanding the unofficial measurements, in response to Mr. Chapman's complaints, his command, pursuant to Article 3.C.2 of the Weight Manual, authorizing the Commandant to make procedural determinations in "unique circumstances" where "special consideration is warranted," had him undergo "hydrostatic" weight testing at a private clinic in Cleveland, Ohio. This test showed a body fat percentage of 37.7%. AR285. Mr. Chapman complains, however, that the Weight Manual only authorizes body fat measurement by tape measure around the abdomen, not hydrostatic testing.

In its November 2, 2006, Final Decision, the Board noted the more usual tape measure standard:

> Moreover, while weight is determined on a simple scale, body fat is normally determined by a health specialist using a tape measure around a member's neck and abdomen, which could result in more variation. The Board notes that all but one (June 20, 2005) of the measurements cited in the chart . . . were made by the same health

-18-

>   specialist at the applicant's command, which would likely provide
>   some consistency in the technique used.

AR26.

The Board recognized that Mr. Chapman's hydrostatic testing was authorized, that it "clearly validated the CO's contention that the applicant was not making 'reasonable and consistent progress during probation,'" and that, in any event, the decision on Mr. Chapman's discharge was based not on the hydrostatic testing in September but on the failure of his progress near the mid-point of his probation in August. The Board further noted that the discharge orders for Mr. Chapman were issued on August 30, prior to the hydrostatic testing and prior to the three unofficial measurements outside his chain of command that he relies upon to claim that he achieved weight compliance.

Given that the Weight Manual and the Personnel Manual include no requirements that the Coast Guard must heed unofficial, outside of chain-of-command weight measurements, the Court does not find that the Board's decision was arbitrary and capricious in deferring to the Coast Guard's disregard of those proffered measurements. In addition, those measurements were taken after Mr. Chapman's discharge orders had been issued and only a few weeks before the September 27 date on which his discharge was effective. The results of the hydrostatic testing on September 13 merely added strength to his command's finding that his progress at the probation mid-point was not reasonable and continuous.

Mr. Chapman would have the Court reverse the Board and the Coast Guard on a finding that the Coast Guard's treatment of Mr. Chapman "shocks the conscience." Pl.'s Cross-Mot. at 46. While the consequences for him were severe, the Court does not find that the Board's decision upholding the Coast Guard's discharge of Mr. Chapman for weight control failure was lacking substantial evidence or was arbitrary or capricious.

V.   Conclusion

For the reasons stated above, the Court grants judgment upon the administrative record in favor of Defendant and denies Plaintiff's cross-motion for the same. The Clerk is directed to enter judgment accordingly.

>   s/ Edward J. Damich
>   EDWARD J. DAMICH
>   Judge